**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CAPITAL RX INC., | Case No. |
|      Plaintiff, | |
|   v. | |
| ANGELA KHAN and SLATE RX, LLC, | **VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF AND MONETARY DAMAGES** |
|      Defendants. | **Jury Demand Endorsed Hereon** |

Plaintiff Capital Rx, Inc., by and through its undersigned counsel, hereby complains of Defendants Angela Khan and Slate Rx, LLC and alleges as follows:

**PARTIES**

1.      Capital Rx Inc. ("Capital Rx" or the "Company") is a Delaware corporation with its principal place of business in New York, New York.

2.      Angela Khan, formerly known as Angela Cousineau ("Khan"), is a citizen of the State of Florida and resides in Miami, Florida.  Khan is a former Senior Director of Client Operations and Vice President of PBA Client Services at Capital Rx, who managed business relationships with clients of Capital Rx.  Khan is now employed by Slate Rx, LLC in the same or a similar capacity.

3.      Slate Rx, LLC ("Slate Rx") is a Delaware limited liability company with its principal place of business in Las Vegas, Nevada.  Slate Rx is a direct competitor of Capital Rx in the pharmacy benefits industry and conducts business in the State of New York.

## JURISDICTION AND VENUE

4.      This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because one of Capital Rx's claims against the Defendants arises under the Defend Trade Secrets Act, 18 U.S.C. § 1832, *et seq*.

5.      This Court has supplemental subject matter jurisdiction over Capital Rx's state law claims pursuant to 28 U.S.C. § 1367(a).  The state law claims are so related to the federal claim that they form part of the same case or controversy under Article III of the United States Constitution.

6.      This Court has personal jurisdiction over Khan by virtue of Section 5.6 of the Employee Non-Disclosure and Invention Assignment Agreement that Khan executed on July 11, 2020 (the "Agreement").  A true and accurate copy of the Agreement is attached hereto as **Exhibit A**.  Section 5.6 of the Agreement provides that:

> any and all matters arising directly or indirectly herefrom shall be governed by and construed and enforced in accordance with the internal laws of the State of New York,"  and that "[f]or all matters arising from or relating to this Agreement and [her] employment with [Capital Rx], [Khan] irrevocably consents and submits to the sole exclusive jurisdiction of the United States District Court for the Southern District of New York and any state court in the State of New York that is located in New York County (and of the appropriate appellate courts from any of the foregoing) . . .

7.      This Court has personal jurisdiction over Slate Rx because it is engaged in and transacts business in the State of New York.  This Court also has personal jurisdiction over Slate Rx pursuant to CPLR § 302(a) because the conduct underlying Capital Rx's claims caused a tortious injury to Capital Rx in the State of New York, and the exercise of personal jurisdiction over Slate Rx would not offend traditional notices of fair play and substantial justice.

8.      Venue is proper in this district pursuant to 28 U.S.C. § 1391.

2

**FACTUAL ALLEGATIONS**

**A.    Capital Rx's Business**

9.    Capital Rx was founded in 2017 as a next generation pharmacy benefits manager (a "PBM") and pharmacy benefits administrator (a "PBA").

10.    A PBM is a third-party entity that manages prescription drug benefits on behalf of health insurance plans, employers, or government programs, with the goal of optimizing the cost and effectiveness of prescription drug coverage.  To do so, PBMs process and administer prescription drug claims, negotiate drug prices with manufacturers, establish and manage formularies (*i.e.*, the lists of prescription drugs that a health insurance plan covers), implement cost-containment strategies, and provide other services related to pharmacy benefits.

11.    A PBA is an entity responsible for the administrative aspects of pharmacy benefits within a healthcare organization. This may include overseeing the day-to-day operations of the pharmacy benefit program, ensuring compliance with regulations, managing relationships with pharmacies and drug manufacturers, and handling the administrative aspects of drug utilization.

12.    At the time of Capital Rx's founding, the PBM/PBA industry was rife with complex contracts, opaque drug pricing, and aging legacy pharmacy claim processing technology.  These issues fueled rising costs and decimated client and member confidence.

13.    Capital Rx's mission is to combat these cost and transparency issues for clients, including employers, employer groups, third-party administrators ("TPAs" and each a "TPA"), labor unions, health insurance plans, public sector groups, health systems and other payors throughout the United States.

14.    As of 2024, Capital Rx (i) works with over 62,000 pharmacies, including all major chains and most independents; and (ii) manages pharmacy benefits for over 2 million individuals that receive health insurance through its clients.

**B.    Capital Rx's Trade Secrets**

15.    Capital Rx has developed significant goodwill with its clients by driving down prescription drug costs, creating more transparency, passing through all rebates, and delivering service excellence and operational efficiencies through its cloud-native enterprise health platform, JUDI®.

16.    JUDI® unifies all pharmacy operational and administrative tasks—including claims adjudication, data integration, prior authorization, patient communication, client reporting, invoicing, reimbursement, and more—within one flexible, user-friendly ecosystem.  It also materially upgrades electronic claim processing infrastructure to improve operating efficiency, drug price visibility, and patient outcomes.

17.    Capital Rx has invested, and continues to invest, millions of dollars to develop, market, and sell its unique offerings, including the capabilities of JUDI® and its unmatched client service.  These offerings cannot be readily replicated at a high level by its competitors due to Capital Rx's considerable experience in the industry and knowledgeable employees.

18.    Capital Rx has devoted extensive time, money, and other resources to design and develop its confidential information and trade secrets including, but not limited to, the capabilities of JUDI®, business development plans and strategies, sales plans and strategies, marketing plans and strategies, product service plans and strategies, client service plans and strategies, including the PBA Client Services Playbook (the "Playbook"), financial plans, financial records and ledgers, pricing information, pricing margins, servicing methodologies for clients, prospective client leads, client lists, client contract details, employment and independent contractor records, training methodologies for managerial and technical employees, and other processes and techniques.

19.    As the fastest growing business of its kind in nation, Capital Rx's business and unique level of success is based on its confidential information and trade secrets.

4

20.     Capital Rx's confidential information and trade secrets are not generally known outside Capital Rx and it takes steps reasonable under the circumstances to protect its confidential information and trade secrets, including but not limited to, having all employees with access to such information execute non-disclosure agreements before receiving access to the confidential information, limiting access to certain information to only the individuals at Capital Rx who need this information to perform services on behalf of Capital Rx, advising all employees through its employee handbook and Code of Conduct of the requirement that such information must be kept confidential (which the employee acknowledges in writing), password protecting access to its information technology systems where such information is electronically stored and available, and otherwise reasonably controlling access to such information.

21.     Capital Rx additionally requires certain key employees with access to its confidential information and trade secrets to execute agreements containing reasonable non-competition, non-solicitation and non-disclosure restrictive covenants that prohibit unfair competition and interference with Capital Rx's relationships with its clients and employees.

22.     Capital Rx receives a substantial economic, financial, and business benefit from its confidential information and trade secrets related to the design, development, marketing, selling, and implementation of its services identified above not being publicly available or used by competitors.  Accordingly, the above information are trade secrets under the Defend Trade Secrets Act. § 13-24-1, *et seq.*, and are hereinafter referred to as Capital Rx's "Trade Secrets."

23.     Given the burgeoning nature of the next generation PBM/PBA industry, Capital Rx takes the precautions mentioned above to maintain the secrecy of its Trade Secrets because Capital Rx would suffer great and irreparable competitive harm if its Trade Secrets were obtained by, or

used on behalf of, its competitors, or if the goodwill and competitive advantage that it has built with its clients and employees were to be used by a competitor.

**C.      Khan's Employment with and Post-Employment Obligations to Capital Rx**

24.      On or about July 11, 2020, Capital Rx hired Khan—who, at the time, went by her maiden name, Cousineau—in the position of Senior Director, Client Operations.

25.      In that position, Khan was charged with overseeing pharmacy benefits services for Capital Rx's commercial clients, including private employers, employer groups, labor unions, health systems, and government entities.

26.      Khan led a team of client service professionals who managed the relationships with Capital Rx's various commercial clients and directly serviced the relationships for Capital Rx's larger commercial clients.  She was also intimately familiar with those clients' contracts with Capital Rx, including their renewal dates, and how and when they were bid.

27.      Knowing the renewal dates and terms of client contracts is particularly important. The contracts typically run on rolling three-year terms, beginning and ending on a certain date of a particular calendar year.  Knowing when a client is in the last year of its contract and the date on which the contract expires allows Capital Rx to pitch or rebid the client's business on the same pricing terms in advance of the contract's expiration.  This allows Capital Rx to maintain the client's business without having to bid against competitors in the open market.

28.      Knowledge of these renewal dates and client contract terms in the hands of a competitor would therefore be extremely damaging to Capital Rx because the competitor would know exactly which clients to pitch, as well as when and on what terms to pitch them.  Indeed, a competitor could easily and knowingly underbid Capital Rx for its client's business without Capital Rx even knowing it was happening.

29.    Khan possessed direct knowledge of such terms, as well intimate details regarding client contact information, and the details of certain clients' relationships with Capital Rx, including service levels required for each client, the pricing methods and terms to which each client was subject, and any and all guarantees, administrative fees and rebates used for each client. She was further able to identify gaps and opportunities in the services clients were receiving through these contracts.

30.    Khan also had intimate knowledge of Capital Rx's member-per-month model, training documents, training systems, and materials used for new hires.  She knew the capabilities of JUDI®, both internally and from a client-facing standpoint.  And, she had access to internal JUDI® staging, such that she could see future iterations of the platform on Capital Rx's internal systems before it was released to clients.

31.    In her role as Senior Director, Client Operations, and later as Vice President of PBA Client Services, Khan routinely used Capital Rx's Trade Secrets to directly or indirectly service its clients.

32.    Given her exposure to Capital Rx's Trade Secrets and intimate knowledge of and work on behalf of its clients, Capital Rx required that Khan, as a condition of employment, sign the Agreement.

33.    Section 2.3 of the Agreement contains a non-disclosure provision, which prohibits Khan from disclosing or using Capital Rx's Trade Secrets at any time for her personal benefit, for the benefit of any other person or entity, or in any manner adverse to the interest of the Company. The non-disclosure provision provides as follows:

> 2.3    **Protection of Confidential Information.** At all times during my employment and thereafter, I will hold the Confidential Information in the strictest confidence. During my employment, I will use the Confidential Information only in the performance of my

duties for the Company. I will not use or disclose the Confidential Information, directly or indirectly, at any time during or after my employment by the Company except as to persons authorized by the Company to receive this information. I will not use the Confidential Information, directly or indirectly, at any time during or after my employment by the Company, for my personal benefit, for the benefit of any other person or entity, or in any manner adverse to the interest of the Company. I will take all action reasonably necessary to protect the Confidential Information from being disclosed to anyone other than persons authorized by the Company.

34. Section 4 of the Agreement contains non-competition covenant, which prohibits Khan during her employment and for a period of one (1) year following the termination of her employment, from directly or indirectly assisting, working for, or otherwise being connected to any business that competes directly or indirectly with Capital Rx by providing technology or services related to pharmacy benefits or pharmacy data services (except those provided by medical insurance or medical health plans). The non-competition covenant provides as follows:

### 4. <u>Non-Solicitation; Non-Compete</u>

In order to protect the legitimate business interests of the Company and in consideration of the Company's willingness to provide me access to its Confidential Information and employment, I agree that during the term of my employment with the Company and for a period of one (1) year after the termination of my employment with the Company for any reason, I will not directly or indirectly, whether as owner, sole proprietor, partner, shareholder, director, member, consultant, agent, founder, co-venture partner or otherwise, (i) do anything to divert or attempt to divert from the Company any business, including, but not limited to, solicit or interfere with any of the Company's customers, clients, members, business partners or suppliers; (ii) solicit, induce, recruit or encourage any person engaged or employed by the Company to terminate his or her employment or engagement with the Company, or (iii) assist in, engage in or otherwise be connected to or benefit from any business competitive with that of the Company, whether directly or indirectly, and whether as an owner, stockholder, member, partner, joint venturer, officer, director, consultant, advisor, independent contractor, agent, or employee, provided, however, that I may own, as a passive investor, publicly-traded securities of any business

8

competitive with that of the Company so long as such securities do not, in the aggregate, constitute more than three percent (3%) of any class of outstanding securities of such corporations. For the purposes of this Agreement, a "business competitive with that of the Company" shall mean one that provides technology or services related to pharmacy benefits or pharmacy data services, excluding an operating business delivering medical insurance or medical health plans.

35.    Section 5.2 of the Agreement provides that a breach of any of its provisions, including the non-compete provision, would cause Capital Rx to "suffer immediate and irreparable harm," for which "monetary damages would be an inadequate remedy," and which would entitle Capital Rx to restrain her "on a temporary, preliminary and permanent basis."  Specifically, Section 5.6 of the Agreement provides as follows:

> **Remedies.** I understand and agree that if I breach or threaten to breach any of the provisions of this agreement the Company would suffer immediate and irreparable harm and that monetary damages would be an inadequate remedy. I agree that, in the event of my breach or threatened breach of any of the provisions of this agreement, the Company shall have the right to seek relief from a court to restrain me (on a temporary, preliminary and permanent basis) from using or disclosing Company Confidential Information, Third Party Information, Proprietary Rights or Inventions or otherwise violating the provisions of this agreement, and that any such restraint shall be in addition to (and not instead of) any and all other remedies to which the Company shall be entitled, including money damages. The Company shall not be required to post a bond to secure against an imprudently granted junction (again, whether temporary, preliminary or permanent).

36.    Section 5.6 of the Agreement provides that the Agreement is governed by New York law and that Khan consents to the jurisdiction of the federal and state courts located in New York County, New York.  Specifically, Section 5.6 of the Agreement provides, in relevant part, as follows:

> any and all matters arising directly or indirectly herefrom shall be governed by and construed and enforced in accordance with the internal laws of the State of New York,"  and that "[f]or all matters

9

arising from or relating to this Agreement and [her] employment with [Capital Rx], [Khan] irrevocably consents and submits to the sole exclusive jurisdiction of the United States District Court for the Southern District of New York and any state court in the State of New York that is located in New York County (and of the appropriate appellate courts from any of the foregoing) . . .

37.     In March 2022, Capital Rx promoted Khan to Vice President of PBA Services.  In this role, she managed Capital Rx's pharmacy benefits administration for health insurance plans and TPAs.

38.     TPAs handle the administrative and operational work for a health insurance plan. TPAs partner with Capital Rx to streamline the adjudication of pharmaceutical claims, thereby saving money that they can pass along to the plan and its downstream customers (such as employers).

39.     As VP of PBA Services, Khan largely worked with the health plans and TPAs, as well as their consultants and brokers. She also interacted with the downstream customers of the health plans and TPAs, as well as their customers, consultants, and brokers.

40.     Because she oversaw a team that serviced these clients, Khan drafted and maintained Capital Rx's Playbook.

41.     The Playbook is marked "For Internal Use Only" and is a living document that seeks to align the goals and objectives of Capital Rx's teams for the PBA side of the business to maintain strong client relationships, retain client business, and grow strategic opportunities.

42.     Among other things, the Playbook defines Capital Rx's client service level commitments and lays out processes to (i) improve internal workflows and communications, resource capacity forecasting and planning, and training and support on market dynamics and trends; (ii) solidify and share client service best practices; (iii) increase collaboration and transparency; (iv) ensure consistent alignment between the Client Services, Sales and Marketing

teams; and (v) ensure a consistent review of all clinical positioning, messaging, and materials on a regularly scheduled basis.

43.     Khan also had access to certain files with the following names: the Capital Rx JUDI Overrides Guide (the "JUDI Overrides Guide"), Command Center_2024 (the "Command Center") and Net Cost Estimator Template_INTERNAL USE ONLY (the "Net Cost Estimator").

**D.     Khan Gives Notice of Her Resignation and Then Misappropriates Files Containing Capital Rx's Trade Secrets**

44.     On January 3, 2024, Khan notified her supervisor, Alyssa Wagner ("Wagner"), that she was resigning from Capital Rx effective January 16, 2024.

45.     In a follow-up email to Wagner on January 3, 2024 (the "January 3 Email"), Khan wrote: "I'm deeply grateful for the experience and opportunities during my tenure here," and listed some final items that she would finish before her last day at Capital Rx.  Conspicuously absent from that list were any planned updates to or use of the Playbook, the JUDI Overrides Guide, the Command Center, or the Net Cost Estimator.  A true and correct copy of the January 3 Email is attached hereto as **Exhibit B**.

46.     Khan concluded her follow up email by stating: "I wish all the success and growth for Capital Rx and the client service team."

47.     In the days just before or closely following her resignation, Khan downloaded several files containing Trade Secrets from Capital Rx's SharePoint cloud-based site ("SharePoint") to her computer, including, but not limited to, the JUDI Overrides Guide, the Command Center, and Net Cost Estimator.

48.     Then, on January 12, 2024, just four days before her last day at Capital Rx, Khan emailed the Playbook to her Gmail account.

11

49.    Capital Rx is not aware of any reason Khan would have had for sending the Playbook to her personal Gmail account or downloading these files from SharePoint in her final remaining days at Capital Rx, and Khan had no right to continued possession of them upon her departure from Capital Rx.

50.    On January 16, 2024, Khan officially resigned from Capital Rx.

**E.    Khan Begins Working for Capital Rx's Direct Competitor, Slate Rx**

51.    Less than two months after resigning from Capital Rx, Khan began working for Slate Rx as an Assistant Vice President of Business Development.

52.    Slate Rx is a direct competitor of Capital Rx because it provides technology or services related to pharmacy benefits or pharmacy data services and is not an operating business delivering medical insurance or medical health plans.

53.    As Slate Rx explains on its website, it "provides simple and affordable pharmacy benefit programs to employer groups, unions, public sector groups, health systems, and other payers throughout the United States," and "create[es] real value for plan sponsors on day one through purchasing scale and continued management via innovation and transparency."

54.    Slate Rx's website further explains that its "Mission" is to "[r]evolutioniz[e] the pharmacy benefit experience—PBX™—to optimize medication access, improve health outcomes, and control costs for those who receive and pay for healthcare," and its "Vision" is "[t]o disrupt and improve an out-of-touch healthcare model to make pharmacy benefits simple and affordable for plan sponsors and members."

55.    Thus, by working for Slate Rx within one (1) year of her resignation from Capital Rx, Khan has breached (and continues to breach) her post-employment contractual obligations to Capital Rx contained in Section 4 of the Agreement.

**F.    Capital Rx Demands that Khan Cease and Desist from Breaching Her Post-Employment Obligations**

56.    On March 22, 2024, Capital Rx sent a letter, through to counsel, to Khan (the "March 22 Letter").  The March 22 Letter notified Khan of Capital Rx's understanding that she recently became employed by Slate Rx, and that Slate Rx "is a direct competitor of Capital Rx." It then reminded Khan of her post-employment obligations under the Agreement and explained that her employment as Assistant Vice President of Business Development for Slate Rx is a breach of her obligations.  A true and accurate copy of the March 22 Letter is attached hereto as **Exhibit C**.  A copy of the Agreement was enclosed with the March 22 Letter.

57.    The March 22 Letter also provided that Capital Rx's investigation of Khan's conduct revealed that she wrongfully took several confidential documents containing Capital Rx's Trade Secrets just prior to her resignation.

58.    The March 22 Letter further demanded that Khan prepare a sworn affidavit in which she (i) identifies each and every document or other forms of information belonging to Capital Rx which are under her possession or control; (ii) agrees to immediately cease and desist from soliciting for business any of Capital Rx's customers, clients, members, business partners, suppliers or employees and begin adhering to the one-year post employment period; and (iii) return any and all forms of Capital Rx's data, documents or equipment currently in her possession without keeping any copies or duplicates.  (*Id.*)

59.    A copy of the March 22 Letter and the Agreement was also sent to Slate Rx.

60.    On March 29, 2024, an attorney representing Khan responded by letter (the "March 29 Letter"), stating that Khan "has not and does not intend to violate her Agreement with Capital Rx, and her employment with Slate Rx constitutes neither a breach of her Agreement with Capital

Rx nor tortious interference with that Agreement by Slate Rx." A true and accurate copy of the March 29 Letter is attached hereto as **Exhibit D**. This letter is facially false, because indeed Khan had at this point in time already violated multiple provisions of the Agreement through her conduct, as delineated above.

61. On April 26, 2024, Capital Rx demanded by letter that Slate Rx terminate Khan's employment (the "April 26 Letter"). Slate Rx and Khan never responded to the April 26 Letter. A true and accurate copy of the April 26 Letter is attached hereto as **Exhibit E**.

62. Defendants' wrongful activities are likely to cause Capital Rx to suffer irreparable harm including the loss of its Trade Secrets, customer relationships, goodwill, and competitive advantage.

63. More specifically, Khan's knowledge of when certain Capital Rx client contracts are up for renewal, as well as the pricing terms and service levels of those client contracts, will enable Slate Rx to pitch and bid (or underbid) for these clients' business before the clients' current contracts with Capital Rx expire and before Capital Rx is even able to provide a competing bid.

64. In other words, Khan's knowledge of Capital Rx's Trade Secrets allows Slate Rx to unlawfully and surreptitiously poach Capital Rx's clients.

65. Unless injunctive relief is entered precluding Defendants from using Capital Rx's Trade Secrets and precluding Khan from working for Slate Rx, Defendants will continue to use and disclose Capital Rx's Trade Secrets and unfairly compete with Capital Rx to Capital Rx's detriment, causing irreparable harm to Capital Rx.

## FIRST CAUSE OF ACTION
### (Breach of Contract against Khan)

66. Capital Rx realleges and incorporates herein by reference the allegations set forth in the preceding paragraphs.

67.    Khan and Capital Rx executed the Agreement, which is valid and enforceable.

68.    Capital Rx has performed its obligations under the Agreement by, among other things, employing Khan and disclosing to Khan on Capital Rx's Trade Secrets.

69.    During her employment and after the termination of her employment with Capital Rx, Khan breached the non-disclosure provision contained in Section 2.3 of the Agreement by disclosing and using Capital Rx's Trade Secrets on her behalf and on behalf of Slate Rx to compete with Capital Rx.

70.    Within the one-year period after the termination of her employment with Capital Rx, Khan breached (and continues breaching) the non-competition provision contained in Section 4 of the Agreement by working for Slate Rx, which directly competes against Capital Rx by providing technology and services related to pharmacy benefits or pharmacy data services.

71.    The non-disclosure and non-competition provisions in the Agreement are reasonable in temporal and geographic scope and serve to protect Capital Rx's Trade Secrets, customer relationships, goodwill, competitive advantage, and other legitimate business interests. Enforcement of the Agreement will not injure the public in any respect.

72.    Unless restrained, enjoined, and ordered to specifically abide by her non-disclosure and non-competition obligations under the Agreement by order of this Court, Khan will persist in her breach of contract, thereby causing irreparable harm to Capital Rx.

73.    Capital Rx is also suffering monetary damages in an amount to be determined at trial, but in no event less than Seventy-Five Thousand Dollars ($75,000.00).

## SECOND CAUSE OF ACTION
### (Tortious Interference with Contract Against Slate Rx)

74.    Capital Rx realleges and incorporates herein by reference the allegations set forth in the preceding paragraphs.

15

75. Slate Rx had actual knowledge of the Agreement no later than March 22, 2024.

76. Notwithstanding Slate Rx's actual knowledge of the Agreement, Slate Rx has intentionally procured Khan's breach of the Agreement without justification by continuing to employ Khan in a substantially similar role to one in which she was employed by Capital Rx.

77. Slate Rx's conduct has allowed Khan to compete with Capital Rx for business on behalf of Slate Rx in the pharmacy benefits or pharmacy data services, in breach of the Agreement.

78. But for Slate Rx's intentional and wrongful interference, the Khan likely would have honored the Agreement with Capital Rx.

79. As a direct result of Slate Rx's intentional interference with Capital Rx's contractual relationship with Khan, Capital Rx has been damaged.

80. Unless enjoined, Slate Rx will persist in their unlawful conduct and cause irreparable harm to Capital Rx.

81. Capital Rx is also suffering monetary damages in an amount to be determined at trial, but in no event less than Seventy-Five Thousand Dollars ($75,000.00).

## THIRD CAUSE OF ACTION
### (Misappropriation of Trade Secrets under the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq*., Against Both Defendants)

82. Capital Rx realleges and incorporates herein by reference the allegations set forth in the preceding paragraphs.

83. Capital Rx possesses Trade Secrets from which it derives independent economic value because such Trade Secrets are not generally known or readily ascertainable by competitors so that other persons cannot obtain economic value from its disclosure or use.

84. Capital Rx has expended considerable time, effort, and money developing its trade secrets.

16

85.    Capital Rx also takes reasonable steps to maintain confidentiality with respect to its Trade Secrets, including but not limited to, having all employees with access to such information execute non-disclosure agreements before receiving access to the Trade Secrets, limiting access to the Trade Secrets to only the individuals at Capital Rx who need them to perform services on behalf of Capital Rx, advising all employees through its employee handbook and Code of Conduct of the requirement that such Trade Secrets must remain confidential (and receiving their written acknowledgement for the same), password protecting access to its information technology systems where its Trade Secrets are electronically stored and available, and otherwise reasonably controlling access to such Trade Secrets.

86.    Khan, by virtue of her role with Capital Rx, was subject to the Agreement and by executing the Agreement, agreed not to disclose or use Capital Rx's Trade Secrets at any time for her personal benefit, for the benefit of any other person or entity, or in any manner adverse to the interest of the Company.

87.    In her role with Capital Rx, Khan had access to and intimate knowledge of Capital Rx's Trade Secrets, including Trade Secrets contained in the Playbook, the JUDI Overrides Guide, the Command Center and the Net Cost Estimator.

88.    Khan has misappropriated, disclosed and used Capital Rx's Trade Secrets on her behalf and on behalf of Slate Rx, without Capital Rx's express or implied consent, and despite Capital Rx's safeguards and her knowledge that access to such Trade Secrets was acquired under circumstances giving rise to a duty to maintain their secrecy and limit their use.

89.    Slate Rx has used (and continues to use) Capital Rx's Trade Secrets for its own benefit, without Capital Rx's express or implied consent, and knowing that its knowledge of such

17

Trade Secrets was derived from or through a person who owed a duty to maintain their secrecy and limit their use.

90.    Khan's actions in misappropriating Capital Rx's trade secret information was done willfully and maliciously.

91.    As a result of Defendants' violations, Capital Rx has and will continue to suffer irreparable harm through the loss of its Trade Secrets, its relationships with its clients, and its ability to compete in the pharmacy benefits market.

92.    Defendants' actions constitute misappropriation of trade secrets, and Capital Rx is entitled to injunctive relief under the Defend Trade Secrets Act, 18 U.S.C. § 1836(b)(3)(A), to protect its trade secret information as well as an award of damages.

**FOURTH CAUSE OF ACTION**
**(Misappropriation of Trade Secrets Against Both Defendants)**

93.    Capital Rx realleges and incorporates herein by reference the allegations set forth in the preceding paragraphs.

94.    Capital Rx possesses Trade Secrets from which it derives independent economic value because such Trade Secrets are not generally known or readily ascertainable by those outside the Company so that other persons cannot obtain economic value from its disclosure or use.

95.    Capital Rx has expended considerable time, effort, and money developing its trade secrets.

96.    Capital Rx also takes reasonable steps to maintain confidentiality with respect to its Trade Secrets, including but not limited to, having all employees with access to such information execute non-disclosure agreements before receiving access to the Trade Secrets, limiting access to the Trade Secrets to only the individuals at Capital Rx who need them to perform services on behalf of Capital Rx, advising all employees through its employee handbook and Code

18

of Conduct of the requirement that such Trade Secrets must remain confidential (and receiving their written acknowledgement for the same), password protecting access to its information technology systems where its Trade Secrets are electronically stored and available, and otherwise reasonably controlling access to such Trade Secrets.

97.    Khan, by virtue of her role with Capital Rx, was subject to the Agreement and by executing the Agreement, agreed not to disclose or use Capital Rx's Trade Secrets at any time for her personal benefit, for the benefit of any other person or entity, or in any manner adverse to the interest of the Company.

98.    In her role with Capital Rx, Khan had access to and intimate knowledge of Capital Rx's Trade Secrets, including Trade Secrets contained in the Playbook, the JUDI Overrides Guide, the Command Center and the Net Cost Estimator.

99.    Khan has misappropriated, disclosed and used Capital Rx's Trade Secrets on her behalf and on behalf of Slate Rx, without Capital Rx's express or implied consent, and despite Capital Rx's safeguards and her knowledge that access to such Trade Secrets was acquired under circumstances giving rise to a duty to maintain their secrecy and limit their use.

100.    Slate Rx has used (and continues to use) Capital Rx's Trade Secrets for its own benefit, without Capital Rx's express or implied consent, and knowing that its knowledge of such Trade Secrets was derived from or through a person who owed a duty to maintain their secrecy and limit their use.

101.    As a result of Defendants' violations, Capital Rx has and will continue to suffer irreparable harm to its Trade Secrets, its relationships with its clients, and its ability to compete in the pharmacy benefits market.  Capital Rx is also suffering monetary damages in an amount to be determined at trial, but in no event less than Seventy-Five Thousand Dollars ($75,000.00).

## FIFTH CAUSE OF ACTION
### (Unfair Competition (Misappropriation) Against Both Defendants)

102.   Capital Rx realleges and incorporates herein by reference the allegations set forth in the preceding paragraphs.

103.   Rather than build its own business by investing the time and capital necessary to do so, Khan and Slate Rx are improperly using knowledge, Trade Secrets, confidential information, and proprietary documents gained from Capital Rx.

104.   Namely, the Trade Secrets and confidential information contained in the files Khan sent to her personal email or downloaded from SharePoint, as well as those known by Khan by virtue of her employment with Capital Rx, were taken from Capital Rx by Khan and have been and continue to be used by Slate Rx to compete against Capital Rx in the same industry.

105.   Defendants actions in misappropriating Capital Rx Trade Secrets and confidential information were done willfully and maliciously.

106.   Specifically, Khan admitted that she emailed herself the Playbook just four days prior to leaving Capital Rx and notwithstanding her agreement not to use or disclose Capital Rx's Trade Secrets and confidential information.

107.   Khan and Slate Rx are inevitably using the Playbook, as well as the JUDI Overrides Guide, the Command Center and the Net Cost Estimator Template, and other Trade Secrets and confidential information belonging to Capital Rx and known by Khan or in her possession for the sole purpose of competing against Capital Rx.

108.   By virtue of the foregoing, Defendants have engaged in unfair competition and continue to compete unfairly with Capital Rx.

109.   As a result of Defendants' unfair competition, Capital Rx has and will continue to suffer irreparable harm to its Trade Secrets, its relationships with its clients, and its ability to

compete in the pharmacy benefits market. Capital Rx has no adequate remedy at law for Defendants' acts described herein. Capital Rx is also suffering monetary damages in an amount to be determined at trial, but in no event less than Seventy-Five Thousand Dollars ($75,000.00)

.

**NOW THEREFORE**, Capital Rx respectfully petitions the Court to enter judgment in its favor against Defendants as follows:

1. For damages caused by Khan's breach of contract, the exact amount of which to be proven at trial;

2. For damages caused by Slate Rx's tortious interference with Capital Rx's contractual relationship with Khan, the exact amount of which to be proven at trial;

3. For damages caused by Defendants' misappropriation of trade secrets under the Defend Trade Secrets Act, the exact amount of which to be proven at trial;

4. For damages caused by Defendants' misappropriation of trade secrets under New York law, the exact amount of which to be proven at trial;

5. For damages caused by Defendants' unfair competition under New York law, the exact amount of which to be proven at trial;

6. For injunctive relief preliminarily and permanently enjoining Khan from:

   a. Further divulging Capital Rx's Trade Secrets;

   b. Assisting in, engaging in or otherwise being connected to or benefitting from any business competitive with that of Capital Rx for the period prescribed by the Agreement or until such later date as deemed just and equitable by the Court;

   c. Doing anything to divert or attempt to divert from Capital Rx any business, including, but not limited to, soliciting or interfering with any of Capital Rx's customers, clients, members, business partners or suppliers; or

   d. Soliciting, inducing, recruiting or encouraging any person engaged or employed by Capital Rx to terminate his or her employment or engagement with Capital Rx.

7. For injunctive relief preliminarily and permanently restraining Slate Rx from engaging or encouraging Khan in any activities that violate the Agreement, including continuing to employ Khan.

21

8.      For costs and attorneys' fees incurred by Capital Rx; and

9.      For such other relief as the Court deems just and equitable.

## JURY DEMAND

Capital Rx demands a trial by jury of all issues so triable.

Respectfully submitted,

Dated:  June 24, 2024

**BENESCH, FRIEDLANDER,
COPLAN & ARONOFF LLP**

*/s/ Rena Andoh*
Justin E. Klein
Rena Andoh
Christopher W. Pendleton

1155 Avenue of the Americas
26th Floor
New York, NY 10036
Tel:  (646) 593-7050

*Attorneys for Plaintiff Capital Rx, Inc.*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CAPITAL RX INC., <br><br> Plaintiff, <br><br> v. <br><br> ANGELA KHAN and SLATE RX, LLC, <br><br> Defendants. | Case No. <br><br><br><br> **VERIFICATION** |

Pursuant to 28 U.S.C. § 1746, I, Alyssa Wagner, declare under penalty of perjury that the following statements are true and correct:

1.      I am a Vice President of Clinical and Client Operations for Plaintiff Capital Rx, Inc. ("Capital Rx"), and I have been authorized to make this verification on behalf of Capital Rx.

2.      I have read Capital Rx's Verified Complaint for Injunctive Relief and Monetary Damages (the "Complaint") and have personal knowledge of the contents thereof.

3.      I declare that, to the best of my knowledge, the factual allegations contained in the Complaint are true and correct.

FURTHER DECLARANT SAYETH NAUGHT.

Date: June 21, 2024                     _____

                                        **ALYSSA WAGNER**

23